UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

_____

**MICHAEL MARANDA**
293 Durkee Lane                                      Case No: _____
E. Patchogue, NY  11772

    and                                              Judge: _____

**MICHAEL MARANDA LLC**,                   <u>**COMPLAINT: OTHER CIVIL: FRAUD;**</u>
293 Durkee Lane                                      <u>**VIOLATION OF OHIO REV. CODE**</u>
E. Patchogue, NY  11772                         <u>**§1707.01, et al.**</u>

               Plaintiffs,

     v.

**DAVID STANFILL**,
7150 Starcliff Ave. NW
North Canton, Ohio 44720

               Defendant.

_____

Plaintiffs, MICHAEL MARANDA, and MICHAEL MARANDA LLC, as and for a Complaint against the defendant DAVID STANFILL, alleges as follows:

<u>**THE PARTIES**</u>

1.     Plaintiff Michael Maranda ("Maranda") is a natural person residing at 293 Durkee Lane, East Patchogue, N.Y.  11772

2.     Plaintiff Michael Maranda LLC ("MMLLC") is a limited liability company organized under the laws of the State of New York with a principal place of business at 293 Durkee Lane, East Patchogue, N.Y.  11772.

3.     Maranda is an owner and manager of MMLLC.

4.     Defendant David Stanfill is natural person who, upon information and belief, resides at 7150 Starcliff Ave. NW, North Canton, Ohio 44720.

5.     At all times mentioned below, Stanfill was the Chief Executive Officer a company called Squirrels Research Labs LLC ("SQRL").  SQRL is a limited liability company organized under the laws of Ohio, with a principal place of business at 121 Wilbur Drive East, North Canton, Ohio 44720.

6.     Upon information and belief, Stanfill was a co-founder of SQRL and, at all times mentioned below, was a member (owner) of SQRL.

7.     On or about November 23, 2021, SQRL filed for chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Ohio.  The bankruptcy case is still pending.

8.     At all times mentioned below, Stanfill was also an officer and, upon information and belief, an owner of another company called Midwest Data Company LLC ("MWDC").  MDWC is an Ohio domestic limited liability company with a principal place of business at 8050 Freedom Ave NW, North Canton, Ohio.

9.     On or about November 23, 2021, MWDC filed for chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Ohio.  The bankruptcy case is still pending.

10.    Plaintiffs do not assert any claims against SQRL or MWDC herein.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332 because both of the plaintiffs are citizens of a different State of that of the defendant, and the amount in controversy exceeds $75,000.   Specifically, as set forth above, presently and during

the events alleged below, plaintiffs Michael Maranda and MMLLC are and have been citizens of East Patchogue, and defendant David Stanfill is and has been a citizen of North Canton, Ohio.  As set forth below, the damages sought substantially exceed $75,000.

12.     Venue is appropriate in the Northern District of Ohio pursuant to 28 U.S.C. §1391(b)(1), because defendant David Stanfill is a resident of the Northern District.  Alternatively, venue is appropriate in the Northern District pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred there.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.     Maranda and MMLLC's Business

13.     Maranda is in the business of investing in enterprises (such as MMLLC) engaged in various segments of the crypto mining business, including crypto miners themselves, and companies that sell crypto mining equipment.

14.     MMLLC is in the business of cryptocurrency mining, or "crypto mining."

15.     Cryptocurrencies, such as Bitcoin or Ethereum, are digital currencies that people can use to purchase goods or services in internet-based transactions.

16.     Crypto miners (like MMLLC) make cryptocurrency spending possible by using special computers to validate the expenditures.  Whereas an expenditure of *physical* currency, such as cash, is self-effectuating (physical delivery of a dollar by one person to another completes the transfer), spending *cryptocurrency* units requires that someone update a centralized digital ledger to debit the spender's crypto wallet and credit the recipient's crypto wallet.  Essentially, crypto miners are service providers that validate the actual transfer of crypto units.

17.     Crypto miners are compensated for their services with cryptocurrency units (such as Bitcoins or Ethereum).  Generally speaking, each time a crypto miner validates a cryptocurrency

expenditure, the miner is compensated with new crypto units equal to a small percentage of the expenditure that it verified.

18.     A critical component to making money as a crypto miner is to operate large numbers of the special mining computers virtually round-the-clock.  Opportunities to validate crypto expenditures (and earn cryptocurrency for doing so) occur spontaneously. Each time someone, somewhere spends cryptocurrency, the "assignment" of validating the transfer is immediately and randomly routed to a crypto miner somewhere in the world who is, at that moment, operating one or more crypto mining computers.  The earning rate is very steady and predictable.  It is no exaggeration to say that in crypto mining, time is money: the longer a crypto miner has its specialty computers plugged in and operating, the more revenue it will earn.

19.     MMLLC operates thousands of cryptocurrency mining computers in the United States, on its own account and for clients.  That is, MMLLC owns thousands of mining computers itself, which it operates to earn profit for itself, and MMLLC also hosts and operates thousands of mining computers owned by third parties in exchange for fees.

**B.     Stanfill Induces MMLLC to Purchases of Cryptocurrency Mining Computers From SQRL**

20.     During 2021, Stanfill held SQRL out as the manufacturer and vendor of cryptocurrency mining computers.

21.     Stanfill, as SQRL's co-founder and CEO, heavily promoted SQRL's cryptocurrency mining computers.

22.     In March 2021, Stanfill marketed SQRL's cryptocurrency mining computers to MMLLC and Maranda.

23.     In March 2021, Stanfill also urged Maranda to invest in SQRL.

24.     During a presentation in March 2021, Stanfill touted the features of several models of its machines with remarks augmented with a slide presentation.  A true and accurate copy of SQRL's slide presentation is annexed hereto as **Exhibit A**.

25.     During the parties' discussions in March 2021, Maranda discussed with Stanfill that MMLLC was in the business of cryptocurrency mining and, if MMLLC purchased computers from SQRL, MMLLC would use those computers for cryptocurrency mining.  Accordingly, Stanfill understood that MMLLC intended to operate the machines for profit, and understood that a failure to deliver machines to MMLLC, as ordered, would result in lost profits.

26.     During the presentations in March 2021, Stanfill also presented SQRL to Maranda and MMLLC as a thriving and vibrant company.  Stanfill indicated that SQRL was growing, and had the financial wherewithal to deliver on its orders.

27.     Based on Stanfill's representations about the capabilities of SQRL's machines and its business overall, Maranda and MMLLC decided to purchase cryptocurrency mining computers from SQRL.

28.     Stanfill's representations were false.  In reality, SQRL lacked the inventory of cryptocurrency miners to satisfy large orders, and its financial condition was precarious (as further detailed below).  Indeed, as noted, by November of 2021, SQRL would be in chapter 11 bankruptcy.

29.     On or about March 26, 2021, MMLLC and SQRL entered into a written Purchase Agreement, in which SQRL agreed to sell, and MMLLC agreed to purchase, cryptocurrency mining computers in two phases.  A true and accurate copy of that Purchase Agreement is annexed hereto as **Exhibit B**.  Maranda negotiated the terms of sale with Stanfill.  The first phase would consist of two hundred fifty (250) model JC35X1 machines for a price of $800 each and one

hundred twenty-five (125) model JCC2L motherboards for the machines at no additional price. (*See* Exhibit B pg. 3.)  The second phase would consist of three hundred fifty (350) model JC35X1 machines for a price of $857.14 each and one hundred seventy-five (175) model JCC2L motherboards for the machines at no additional price.  (*Id.*)

30.     Under the terms of the agreement, SQRL would deliver the machines to MWDC's crypto mining facility in North Canton, Ohio.  MWDC would operate them there for MMLLC. Section 5 of the Purchase Agreement (Exhibit B) required SQRL to have the first phase of machines "running" within seven (7) days of MMLLC's payment of the purchase price, and required SQRL to have the second phase of machines "running" within fourteen (14) days after payment of the purchase price.

31.     MMLLC paid the entire purchase price for both phases (totaling $499,999.00) on March 26, 2021.

32.     On or about April 13, 2021, MMLLC and SQRL entered into a second Purchase Agreement, in which SQRL agreed to sell, and MMLLC agreed to purchase, four hundred (400) model FPGA crypto mining computers for $1,000 each ($400,000.00 total).  Maranda and Stanfill negotiated this purchase.  Like the prior order from March 2021, these 400 machines were to be delivered to MWDC's facility in North Canton, where MWDC would operate them for MMLLC. Pursuant to section 5 of this April 13, 2021 agreement, SQRL promised to have these machines "installed and online by May 1, 2021."  A true and accurate copy of the April 13, 2021 Purchase Agreement is annexed hereto as **Exhibit C**.

33.     MMLLC completed payment of the entire purchase price for the machines covered by the April 13, 2021 Purchase Agreement (Exhibit C) by May 27, 2021.

34.     On or about April 27, 2021, MMLLC and SQRL entered into another Purchase Agreement in which SQRL agreed to sell, and MMLLC agreed to purchase, eighty-four (84) more model FPGA crypto mining computers for a price of $1,200.00 each (a total of $100,800). Maranda and Stanfill negotiated this purchase.  Like the prior orders, these machines were to be delivered to MWDC's facility in North Canton, where MWDC would operate them for MMLLC. Pursuant to section 5 of this April 27, 2021 Purchase Agreement, SQRL promised to have these machines "installed and online by June 4, 2021."  A true and accurate copy of the April 27, 2021 Purchase Agreement is annexed hereto as **Exhibit D**.

35.     MMLLC completed payment of the entire purchase price for the machines covered by the April 27, 2021 Purchase Agreement (Exhibit D) by May 27, 2021.

36.     In May 2021 MMLLC and SQRL negotiated the purchase and sale of additional cryptocurrency mining computers.  Maranda and Stanfill negotiated these purchases and sales by email, telephone and other means, and SQRL memorialized the terms of the agreements in a series of written Invoices dated May 2, 2021, May 4, 2021, four invoices dated May 26, 2021, and three invoices dated June 1, 2021.  A true and accurate copy of all of said invoices, issued by SQRL to MMLLC, is annexed hereto as **Exhibit E**.

37.     Pursuant to the Invoices annexed as Exhibit E, MMLLC purchased from SQRL an additional four thousand three hundred fifty (4,350) cryptocurrency mining computers, all of which were "JCM" or "JCM35 Module" models.[1]  The total purchase price for all units that MMLLLC purchased in connection with the Invoices in Exhibit E is $10,435,450.

---

[1]     One of the Invoices, dated 4, 2021, was not for the purchase of new machines, but added a charge of $15,000.00 which was a negotiated price increase for the machines that MMLLC purchased through the the previous Invoice dated May 2, 2021 that is part of Exhibit E.

38.     MMLLC completed payment of the entire purchase price for all of the Invoices in Exhibit E by May 2021.  Henry Terranova, one of the members of MMLLC, paid $230,000 of the purchase price to SQRL directly out of his own funds, on behalf of MMLLC, and MMLLC paid the remainder of the purchase price to SQRL.

39.     As with MMLLC's prior purchases from SQRL, the computers purchased pursuant to the invoices in Exhibit E were to be delivered to MWDC's mining facility in North Canton, where MWDC would operate them for MMLLC.  For the computers ordered pursuant to the May 2, 2021 Invoice (amended in the May 4, 2021 Invoice), SQRL agreed to have the computers "online within (12) hours of confirmed payment."  (*See* Exhibit E pg. 2.)  For all of the other machines computers that MMLLC purchased pursuant to the Invoices in Exhibit E, SQRL promised to have the machines "online during June 2021" or "online within June 2021."  (*See* Exhibit E pg. 3 – 9.)

40.     Between the contracts annexed hereto as Exhibits B, C and D and the Invoices annexed hereto as Exhibit E, MMLLC purchased a total of six thousand one hundred (6,100) cryptocurrency mining computers from SQRL, for a total purchase price of $11,436,249 (which MMLLC paid in full).

41.     During all of the foregoing negotiations, Stanfill knew or reasonably should have known that SQRL did not have sufficient inventory of machines to fill these orders and fill them on time.

**C.     SQRL's Failure to Satisfy the Orders**

42.     As noted, MMLLC purchased and paid for a total of Six Thousand One Hundred (6,100) cryptocurrency mining computers from SQRL.

43.     SQRL only delivered two thousand one hundred thirty (2,130) of said cryptocurrency mining computers and failed ever to deliver the remainder of the computers.

44.     Moreover, with regard to the two thousand one hundred thirty (2,130) computers that SQRL did deliver, SQRL delivered them late.  Under the terms of the Purchase Agreements and Invoices, SQRL should have delivered and had all of the computers up and running by June 2021, but did not deliver the 2,130 computers until well into July 2021.

45.     From June through August 2021, SQRL made numerous false excuses for not delivering most of the computers including, without limitation, that some of them were damaged in a fire. On July 20, 2021, David Stanfill of SQRL represented to Maranda that Cincinnati Insurance Company would cover the loss, but to date SQRL has not used any insurance proceeds to reimburse MMLLC for undelivered machines or any other damages.

46.     Because of SQRL's failure to deliver most of the computers, from June 2021 through August 2021, MMLLC lost the opportunity to mine Ethereum using those computers. Consequently, MMLLC lost profits in an amount to be determined at trial, but of no less than $3.5 million.

47.     On July 20, 2021, Stanfill represented to Maranda that SQRL had not delivered the overdue machines to MMLLC because there was a fire at SQRL's warehouse, which damaged a portion of SQRL's inventory.

48.     Upon information in belief, the representation about the fire was false.  Upon information and belief, SQRL in fact sold machines that it had promised to MMLLC to third-parties, and attempted to conceal this by claiming that those machines were damaged in the alleged fire.

49.     By fall 2021, the Plaintiffs lost confidence in SQRL's willingness or ability to deliver the remainder of the computers.  MMLLC negotiated a transaction with a third-party company called Instantiation LLC, in which MMLLC would sell its interest in all of the SQRL computers that it had purchased (both those that were delivered and those that were undelivered[2]). MMLLC and Instantiation closed on that transaction in October 2021.

50.     Through this sale to Instantiation, MMLLC recouped the purchase price it had paid SQRL for the computers, but did not recoup its lost profits incurred as a result of SQRL's failure to deliver the machines, during June 2021 through October 2021.

51.     Moreover, MMLLC recouped less than market value of the machines from Instantiation.  MMLLC sold the machines to Instantiation for a price of $1,200 per unit.  The fair market value of the machines was actually at least $1,800 per unit.  However, MMLLC could find no other buyers for the machines at the time, and was constrained to sell at the $1,200 price to cut its losses.  As a result of selling at that price, MMLLC lost at least another $3.2 million in value.

## C.     Stanfill Induces Maranda to Invest in SQRL

52.     During the same time that Stanfill and Maranda were negotiating the purchase and sale of the above-referenced cryptocurrency mining computers, Stanfill proposed that Maranda and/or MMLLC invest in SQRL.

53.     Stanfill represented to Maranda SQRL was a vibrant and growing company, realizing and poised to continue realizing ample revenues through the sale of its crypto currency miners, of which Stanfill claimed SQRL a stable and steady inventory.

54.     Based on Stanfill's representations about SQRL's health and prospects, and the capabilities of its crypto miners, Maranda agree to cause MMLLC to invest $293,750.00 in SQRL,

---

[2]     Instantiation was willing to accept the risk associated with whether SQRL would ultimately deliver the undelivered machines.

in exchange for 6,000 units of membership interest in SQRL.  A true and accurate copy of the Membership Unit Purchase Agreement for that acquisition is annexed hereto as **Exhibit F**.

55.     MMLLC paid the sum of $293,750.00 to complete the investment, and acquired its 6,000 units of ownership interest.

56.     At the time that Stanfill made his representations about the condition and capabilities of SQRL to induce MMLLC's investment, Stanfill was aware that his representations were false.   Among other things, Stanfill knew (but did not disclose) that SQRL's continued viability relied on completing a transaction with Avnet, Inc. for which SQRL would need to raise approximately $3.5 million, and that SQRL was not on target to raise those funds.

57.     Among other things, Stanfill knew (but did not disclose) that as a result of its fund raising shortfall, SQRL was forced to sell off its inventory to third-parties at a very low margin.

58.     Among other things, Stanfill knew (but did not disclose) that it was on the verge of seeing its debt service expenses double from $80,000 to $160,000, an increase that would be unsustainable for SQRL.

59.     Among other things, Stanfill knew (but did not disclose) that SQRL was on the verge of defaulting on a promissory note held by Avnet, pursuant to which Avnet had a security interest in essentially all SQRL assets.

60.     If Stanfill had disclosed any of the foregoing facts or circumstances during his glowing presentations to Maranda and MMLLC concerning SQRL's operations and prospects, MMLLC would not have invested in SQRL.

### FIRST CAUSE OF ACTION
**(Fraud)**

61.     The Plaintiffs re-state, re-allege and incorporate by reference the allegations set forth in all of the preceding paragraphs of this Complaint as though fully set forth in this paragraph.

62.     Stanfill's above-described representations to Maranda and MMLLC about SQRL's financial condition, its inventory of machines, the capabilities of its machines, and SQRL's prospects were false, and known to be false by Stanfill when he made the representations.

63.     Stanfill made said representations with utter disregard and recklessness as to whether they were true.

64.     Stanfill's misrepresentations were material.  MMLLC would not have ordered and paid for cryptocurrency mining computers from SQRL if MMLLC and Maranda had known that SQRL was unable to deliver 6,100 machines by July 2021.  MMLLC would not have invested in SQRL it had been aware that lacked sufficient inventory to complete orders, that SQRL was about to experience increased, crushing debt service expense, that SQRL was on the verge of defaulting on a promissory note held by a secured creditor with a lien on substantially, all of SQRL assets, that SQRL was selling off inventory at low margins in a desperate bid to raise sufficient funds to complete a live-or-die transaction with Avnet, and that SQRL was falling short of fundraising necessary to consummate the transaction with Avnet.

65.     Maranda and MMLLC reasonably relied on the foregoing misrepresentations.

66.     As a result of Stanfill's misrepresentations, SQRL entered into the contracts to purchase cryptocurrency mining computers, thousands of which were never delivered, causing MMLLC to lose at least $3.2 million in lost profits (lost crypto mining opportunities) and to incur at least $3.5 million in out of pocket costs to acquire mining computers from another source, as more particularly described above.

67.     As a result of Stanfill's misrepresentations, MMLLC invested $293,750.00 in SQRL that it would not have invested, but for Stanfill's misrepresentations.

## SECOND CAUSE OF ACTION
### (Violation of Ohio Rev. Code §1704.01, *et al.*)

68.     The Plaintiffs re-state, re-allege and incorporate by reference the allegations set forth in all of the preceding paragraphs of this Complaint as though fully set forth in this paragraph.

69.     The membership units in SQRL that were purchased by MMLLC are "securities" as that term is defined in Ohio Rev. Code §1707.01(B).

70.     As described in more detail above, Stanfill made numerous false representations to Plaintiffs concerning material and relevant facts about SQRL, including but not limited false statements regarding SQRL's financial condition, its inventory of machines, the capabilities of its machines, and its prospects.

71.     Such false misrepresentations were made by Stanfill for the purpose of selling securities to MMLLC in violation of Ohio Rev. Code 1704.44(B)(4).

72.     As a result of Stanfill's misrepresentations, MMLLC invested $293,750.00 in SQRL that it would not have invested, but for Stanfill's misrepresentations and has been damaged in the amount of $293,750.00.

73.     Furthermore, MMLLC is entitled to recission of the purchase of the securities pursuant to Ohio Rev. Code §1707.43.

WHEREFORE, Plaintiffs, Michael Maranda and Michael Maranda LLC, respectfully request that the Court grant them judgment against Defendant, David Stanfill, as follows:

A.  For compensatory damages in an amount to be determined at trial, but no less than Seven Million and 00/100 (Dollars);

B.  For punitive damages in an amount to be determined at trial;

C.  For their costs and attorneys' fees expended herein; and

D.  For such other and further relief as the Court deems just and equitable.

13

Respectfully submitted,

LAW OFFICES OF ROBERT E. SOLES, JR., CO., LPA


/s/ Kara Dodson
Robert E. Soles, Jr.  (#0046707)
Kara Dodson (#0075527)
6545 Market Ave. N.
North Canton, Ohio 44721
Telephone: (330) 244-8000
Telefax: (330) 244-8001
E-mail:   bsoles@soleslaw.com
kdodson@soleslaw.com
Counsel for Plaintiffs




INSTRUCTIONS FOR SERVICE

TO THE CLERK:

    Please serve Defendant with Summons and Complaint at the address listed in the caption of this Complaint.


/s/ Kara Dodson
Counsel for Plaintiff